UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 24-CR-10201-PBS |
| | ) | |
| STEVEN MCDONALD | ) | |
| CHRISTOPHER WHITE | ) | |
| QUENTIN MCDONALD, and | ) | |
| ELGUN MIKAIYLOV | ) | |
| Defendants | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT MCDONALD'S MOTION TO SUPPRESS CELL SITE LOCATION INFORMATION**

To investigate and gather potential leads on a brazen, violent, and coordinated robbery of over $436,000 cash outside of a bank in Swansea, Massachusetts, investigators sought records from three wireless providers relating to devices that overlapped two or more towers servicing four distinct geographic area/time windows. While not clearly required to do so, the investigators obtained this information only after applying for and receiving federal search warrants. After analysis, the government identified three devices meriting further review, including a device that belonged to Quentin McDonald (the "Defendant"). Defendant's motion to suppress this information should be denied because (i) the government obtained warrants and (ii) the warrants were sufficiently particular because they were limited in scope to specific time and geographic windows and authorized the search for only those devices that overlapped between two or more cell towers. In addition, the exclusionary rule should not apply to the situation here because the government investigators reasonably relied in good faith on the warrants they obtained.

STATEMENT OF FACTS

A few minutes after 12:30 p.m. on February 19, 2024, a courier, carrying over $436,000 in cash, arrived at a bank in Swansea, Massachusetts to make a deposit. *Affidavit in Support of Search Warrant Application* (attached hereto as Ex. 1) at ¶¶ 13, 15, 18.[1] The courier worked for a company that provided, among other things, cash pick-up and delivery services from area cannabis dispensaries. *Id.* at ¶ 13. That morning, the courier had made pick-ups from dispensaries in Provincetown, Wellfleet, Plymouth, Middleborough, and Fall River. *Id.* His last stop before arriving at the bank—and the dispensary responsible for most of the cash—was in Fall River. Ex. 1 at ¶¶ 13, 15. Because it was President's Day, the bank was closed, so the courier parked his car near the overnight deposit box and began to unload the bags of cash that were located in the rear of his car. *Id.* at ¶¶ 10, 13, 18.

At that moment, a U-Haul van pulled behind and parallel to the courier's vehicle. *Id.* at ¶ 19. An individual, later identified as Christopher White, immediately exited the rear storage doors of the van and approached the courier. *Id.* White was masked, gloved, and carrying a pistol. *Id.* As he approached, White pointed the pistol at the courier, directed him to the ground, and proceeded to use a set of interlocked zip ties to bind the courier's hands. Ex. 1 at ¶¶ 19, 21. Below is a still from the bank's surveillance video showing White approaching the courier with a pistol pointed at the courier.

---

[1] The government hereby attaches the search warrant application for 24-mj-1134 to AT&T. With the exception of the recipient and docket number, the search warrant applications for 24-mj-1148 (Verizon) and -1149 (T-Mobile) are identical.



While this was happening, another individual, later identified as Steven Madison, parked the U-Haul van and began collecting and moving the bags of cash into the van. *Id.* at ¶ 20. After loading the cash, White and Madison tried to remove, without success, the courier's own firearm. *Id.* at ¶ 21. Below is a picture of White and Madison trying to disarm the courier.



After 1-2 minutes, White and Madison gave up and instead forced the courier into the rear of the courier's car. *Id.* at ¶21. White took out a can of pepper spray and sprayed it in the courier's face. Ex. 1 at ¶ 22. White then shut the door and he and Madison got into the U-Haul

van (Madison again driving and White in the rear compartment). *Id.* The courier, meanwhile, had managed to slip out of the zip tie restraints, pulled his own firearm, and fired 4 shots at the U-Haul van as it drove away. *Id.* at ¶ 23.

Madison and White drove approximately a mile away, to the area of Reed Street, an uninhabited stretch of road known as the "Quarter Mile." *Id.* at ¶ 24. A passing motorist, who happened to have a dashboard video camera, captured the U-Haul van at the side of Reed Street while a Jeep Cherokee arrived to meet it. According to the video's timestamp, this occurred at approximately 12:42 p.m. Ex. 1 at ¶¶ 28, 29. A civilian witness also saw two individuals emptying items from the U-Haul van as the van began to smoke and eventually catch on fire. *Id.* at ¶ 25. The witness saw these individuals get into the Jeep Cherokee and speed away. *Id.* While law enforcement initially detained and charged another individual in a different Jeep Cherokee, investigators used the dash camera video to identify a Patriots decal and the license plate for the Jeep Cherokee observed by the witness and found that it was registered to an individual later identified as the Defendant's sister. *Id.* at ¶¶ 25, n. 7, 29-31, 35.

Investigators determined that the U-Haul van used in the robbery had actually been stolen from a U-Haul location in Abington, Massachusetts in the early morning hours (at approximately 12:31-12:35 a.m.) by two individuals believed to be the same as those who conducted the robbery. Ex. 1 at ¶¶ 38-41. Also, in review of the surveillance video at the bank, investigators observed that the U-Haul van had driven through the bank's parking lot and the overnight deposit bin area at approximately 10:52 a.m. (about 2 hours before the robbery) and then parked in the parking lot of a neighboring business to await the arrival of the courier. *Id.* at ¶ 17. Investigators did not see any sign of the Jeep Cherokee at this time or during the time of the robbery. *Id.* at ¶ 30.

Seeking leads and given the ubiquity of mobile phones and the level of coordination required to steal a U-Haul van hours before in Abington, be at the bank in Swansea ahead of the courier (who had traveled from Provincetown), perform the robbery, and be able to—within minutes—be picked up at the side of an uninhabited stretch of road a mile away by the Defendant, investigators had probable cause to believe that the perpetrators were using mobile communication devices. *Id.* at ¶¶ 41-52. With the known presence of the perpetrators at disparate geographic locations (two locations in Swansea and one in Abington) and disparate times (approximately 12:30 a.m. in Abington, 10:52 a.m. and 12:30 p.m. near the bank in Swansea, and 12:42 p.m. on Reed Street in Swansea), the investigators sought records identifying devices and tower communications (colloquially known as a "tower dump") from the three major wireless providers for the towers servicing four geographic areas and time periods (ranging from 15-30 minutes). *Id.* and Att. A. The request as set forth in Attachment A to the warrants is copied below:

|   | Cell Towers | Date and Time |
|---|---|---|
| 1. | The cellular towers that provided cellular service to:<br>**403 Bedford Street,**<br>Abington, Massachusetts | 5:15 A.M. UTC through 5:45 A.M. UTC on February 19, 2024 |
| 2. | The cellular towers that provided cellular service to:<br>**330 Swansea Mall Drive,**<br>Swansea, Massachusetts | 4:30 P.M. UTC through 5:00 P.M. UTC on February 19, 2024 |
| 3. | The cellular towers that provided cellular service to:<br>**330 Swansea Mall Drive,**<br>Swansea, Massachusetts | 5:30 P.M. UTC through 5:45 P.M. UTC on February 19, 2024 |
| 4. | The cellular towers that provided cellular service to:<br>**300 Reed Street,**<br>Swansea, Massachusetts | 5:30 P.M. UTC through 6:00 P.M. UTC on February 19, 2024 |

The warrants did not seek the content of any communications.  Ex. 1 at Att. B(I).  To further limit the scope, the investigators only sought to seize the records relating to devices that appeared in two or more of the towers.  *Id.* at ¶ 53; Att. B(II).  Magistrate Judge Donald L. Cabell issued the requested warrants on March 14, 2024.  *See* 24-MJ-1134, -1148, and -1149.

The records requested from T-Mobile provided information that led to the identification of the perpetrators.  Analysis showed that one device, with an International Mobile Equipment Identity (IMEI) number of 350496303196592 and International Mobile Subscriber Identity (IMSI) number 310260431763043, connected with area towers during four out of the four geographic/time windows. *See Affidavit in Support of Criminal Complaint*, ECF No. 3-1, ¶ 33; *Ex. 1 to Complaint Affidavit*, ECF No. 3-2, ¶ 34-35.  Two other devices with IMEI/IMSI numbers of 359371605363003 / 310260600576411 and 356371480028542 / 310260438077886 appeared in relevant tower for the time of the U-Haul van theft in Abington and at Reed Street in Swansea when the fire occurred. *Id.*  Further subpoenas, search warrants, and investigation led to the identification of White, Madison, and McDonald as the users of these devices.  *See* ECF No. 3-2, ¶¶ 36-44.  Investigators identified the Defendant communicating with his co-defendant Madison at critical points in the timeline of events, including a call just after the completion of the theft of the U-Haul van at 12:36 a.m. and around the beginning and just after the completion of the robbery at 12:36 p.m. and 12:42 p.m.  *See* ECF No. 3-1 at ¶¶ 36, 38.

The Defendant, along with White and Madison, was charged by criminal complaint and arrested on May 8, 2025 for Hobbs Act robbery and conspiracy, in violation of 18 U.S.C. § 1951; maliciously damaging or destroying, by means of a fire or an explosive, a vehicle used in interstate or foreign commerce, in violation of 18 U.S.C. §  844(i); and conspiracy, in violation of 18 U.S.C. § 371.  *See* ECF No. 3.  Presently, through a Superseding Indictment returned on

April 16, 2025, the Defendant is charged with Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 1951, and brandishing and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).  ECF No. 61.

ARGUMENT

The Defendant participated in a robbery that was aided by the use of a cellular phone to, among other things, communicate with his coconspirators.  By his motion, the Defendant essentially argues that the records kept by the wireless provider to facilitate that communication should be completely unavailable to the government to investigate violations of federal criminal law because no process other than a warrant can compel production of these records and a search warrant cannot meet the particularity required unless the government already knows the identity of the perpetrator.  The Court should reject this argument because the Fourth Amendment and the law does not require such result.

I.     DESPITE NO BINDING PRECEDENT REQUIRING ONE, INVESTIGATORS OBTAINED SEARCH WARRANTS.

The Court should decline the Defendant's invitation to hold broadly that obtaining "tower dump" CSLI for narrow time periods is a constitutional "search" that can only be obtained through a search warrant.  Firstly, and primarily, this case does not present that issue for the Court because investigators actually did apply for and obtain warrants here.  But also, secondly, the law does not require it.

The Fourth Amendment protects the public's "right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures..."  U.S. Const. amend. IV.  A search warrant is generally required when there is an official intrusion into a sphere of privacy that society is prepared to recognize as reasonable. *Carpenter v. United States*, 585 U.S. 296, 304 (2018).  As the Supreme Court has commented, the "'ultimate touchstone of the Fourth

7

Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 381 (2014) *quoting Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  In *Carpenter*, the Supreme Court considered orders issued pursuant to 18 U.S.C. § 2703(d) for an individual's CSLI for 152 days and 7 days. *Carpenter*, 585 U.S. at 302.  Concerned about the ubiquity of cell phones and the quantity of data that the government ultimately obtained about Carpenter's movements (127 days), the Supreme Court, in a 5-4 decision, limited the extension of the third-party doctrine and held that the Fourth Amendment required a warrant for that type of CSLI. *Id.* at 312-315.  However, the Supreme Court went on to note that it was not expressing an opinion on "real-time CSLI or 'tower dumps'" and limited its decision to orders requesting at least 7 days of data sought in that case. *Id.* at 316 and 310, n. 3.

For the proposition that the framework of *Carpenter* requires a search warrant for a tower dump revealing the defendant's location at four, 15-30 minute windows, the Defendant cites no binding precedent and two out-of-district opinions (one of which is a magistrate judge's opinion on appeal to the district judge).  *See United States v. Medina*, 712 F.Supp.3d 226 (D.R.I. 2024) (*vacated and remanded on other grounds at* 125 F.4th 310 (1st Cir. 2025), and *In re Four Applications for Search Warrants Seeking Information Associated with Particular Cell Towers*, *sub nom. United States v. SEALED*, 3:25-cr-38, ECF Nos. 38-40 (S.D. Miss. 2025).  Other courts, however, have declined to extend *Carpenter* and require warrants for tower dumps. *See United States v. Pricop*, 775 F.Supp.3d 1036 (D. Ariz. 2025); *United States v. Williams*, 741 F.Supp.3d 642 (E.D. Mich. 2024); *United States v. Walker*, 2020 WL 4065980 (E.D.N.C. July 20, 2020); *United States v. Rhodes*, 2020 WL 9461131 (N.D. Ga. June 18, 2020) *report and rec. adopted at* 2021 WL 1541050 (Apr. 20, 2021); *United States v. Matthews*, 2024 WL 688666 (N.D. Ga. Feb. 20, 2024); *United States v. Dickerson*, 2025 WL 2960141 (E.D. Wisc. June 10,

8

2025) *report and rec. adopted at* 2025 WL 2779095 (Sept. 30, 2025).  This view is more appropriate because the privacy interests for limited periods of time in specific, identified geographic locations are lesser than for the comprehensive chronicle of movement and whereabouts that spanned from 7 to 152 days and was the Supreme Court's concern in *Carpenter*.  One court analogized the records obtained from a tower dump as "more akin to obtaining transactional records traditionally maintained by a third party—similar to old-fashioned, analog telephone toll records or banking records showing deposits and withdrawals in a monthly statement. Or, even more analogous—these records are like electronic records from a 24-hour ATM machine—which can reveal an accountholder's location at different times if she accesses her account at different branches over a period of time." *United States v. Williams*, 741 F.Supp.3d at 651.

Here, to participate in the theft of a U-Haul van in Abington and a robbery in Swansea (and to be in communication with his co-conspirators during these events), the Defendant elected to have a cell phone on his person.  As a number of courts have held, the Defendant did not have a reasonable expectation of privacy in the wireless provider's records indicating his device's registration with towers in the four narrow geographic/time windows at issue here and such non-content information may be obtained through an order issued pursuant to 18 U.S.C. § 2703(d). Again, however, this issue is not properly before the Court because the investigators obtained warrants here. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J. (conc.) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other grounds upon which the case may be disposed of.")

II.    THE WARRANTS WERE SUFFICIENTLY PARTICULAR.

The warrants here identified specific locations, on specific dates, and at specific times, and thus, were sufficiently particular.  The Fourth Amendment requires that warrants "particularly describe the place to be searched, and the person or things to be seized." *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019).  The particularity requirement demands that a valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in that it includes items that should not be seized." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013).  However, "[t]he Fourth Amendment does not require a perfect description of the data to be searched and seized." *United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017) (noting difference between breadth of a warrant and its particularity).  As long as the items are described "with as much particularity as the circumstances reasonably allow," courts "may tolerate some ambiguity of the warrant." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013).

Based on the circumstances, the warrants in this case were sufficiently particular.  The data sought was specifically tailored to and constrained by the facts of the robbery under investigation.  *United States v. James*, 3 F.4th 1102, 1106 (8th Cir. 2021) (holding tower dump warrant for 90-minute windows around robberies under investigation sufficiently particular); *see also In re Search of Information Associated with Cellular Telephone Towers Providing Service to [Redacted] Stored at Premises Controlled by Verizon Wireless*, 616 F.Supp.3d 1, 10-12 (D. D.C. 2022) (holding particularity requirement met for warrant seeking 30 minutes of data at location of interest) and *United States v. Sherod*, 2025 WL 1736279 (D. Md. June 23, 2025) (holding particularity met in warrants seeking 60 or 75 minutes of data around location of two burglaries).  Investigators knew that some or all of the perpetrators were present at

10

geographically disparate locations at distinct times—at the U-Haul in Abington at approximately 12:30 a.m., at a parking lot next to the bank in Swansea at 10:52 a.m., at the bank at approximately 12:30 p.m., and at the side of the road on Reed Street at approximately 12:45 p.m. Ex. 1 at ¶ 18. They also knew, based on the level of coordination and the ubiquity of cellphones, that they carried cellphones. *Id.* at ¶¶ 41-52. The warrants did not seek records for *all* devices across the wireless provider's records. Instead, investigators used the information they had at the time to direct each company to search their records for towers covering three distinct locations for four windows of time, totaling 105 minutes. There is no First Circuit case law that has ruled that this type of search is not sufficiently particular. Like the warrants at issue in *James*, the warrants here sought records for a particular location, on a particular date, and at particular times relating to the target offenses. *James*, 3 F.4th at 1106.

The Defendant's argument ignores the fact that, to further protect the privacy interests of uninvolved individuals (beyond that afforded by the fact that records only indicate device information (IMEI/IMSI and telephone numbers), investigators narrowed the search authorization to only those devices which appeared in two or more towers. ¶ 53; Att. B. In the context of computer data, the seizure can be—and often is—broader than the scope of what may be searched by the government agents. *See United States v. Aboshady*, 951 F.3d 1, 5-7 (1st Cir. 2020); *United States v. Klyushin*, 643 F.Supp.3d 261, 270 (D. Mass. 2022) (Saris, J.).[2] Here, there was probable cause to believe that devices in more than one of the distinct location/time period windows were evidence of the robbery and arson and related crimes, justifying the

---

[2] Preserving the complete production is necessary from an evidentiary integrity/authenticity standpoint. It also preserves for the Defendant the ability to attack/cross-examine the government's conclusions from its analysis.

investigators in conducting further analysis to determine a given device's potential connection to the crime.  To the extent the Defendant challenges the fact that information about the devices of uninvolved third parties only located on of the towers were included in the seizure here, the Defendant lacks standing to do so. *See United States v. Payner*, 447 U.S. 727, 731 (1980).  Even so, the limited intrusion here of having device identifiers (IMEIs/IMSIs/phone numbers) associated with a tower during the limited locations/periods is not sufficiently different from what often happens in other investigative contexts.  As one court noted recently in rejecting a defendant's specificity challenge to a tower dump warrant:

> [I]investigators reviewing surveillance camera footage from a commercial robbery are likely to view others on the footage who were going about their ordinary business. Detectives collecting fingerprints at a bank teller window will likely collect (and possibly even identify) fingerprints belonging to innocent bank customers.  Officers effecting a search of a multiple-resident house or apartment are likely to search the belongings of uninvolved occupants along with those of the suspected perpetrator of the crime. The mere fact of limited intrusion on the privacy interests of innocent persons while executing a valid warrant targeting a viable suspect does not invalidate the warrant or permit one person to assert another's Fourth Amendment claim.
> *United States v. Sherod*, 2025 WL 1736279, at *5.

The District of Nevada decision cited by the Defendant is factually distinct from this case because it involved a request for devices in a six-hour window across two geographic locations, but did not further narrow the search to overlapping devices. *See United States v. Spurlock*, 778 F.Supp.3d 1136, 1140 (D. Nev. 2025).  The Fifth Circuit's decision in *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) is also distinguishable and wrongly decided.  In *Smith*, the Fifth Circuit analyzed a "geofence" warrant to Google and found that Google's search of data across the location data across 590 million devices of was an impermissible general warrant.  *Id*. 110 F.4th at 838.  First, that is not the search that happened here.  As noted above, the government's search was limited to devices that appeared in two or more of the identified geographic/time windows and did not cover hundreds of millions of devices.  The seizure component of the

warrant was also limited to the particular geographic/time windows. This is not the type of unconstitutional rummaging that is the basis for the specificity requirement of the Fourth Amendment.

Second, the *Smith* court wrongly focused on the breadth of the universe of data instead of the parameters of the search in reaching its conclusion. A Fourth Circuit panel reached the opposite conclusion and ruled that no constitutional search even occurred when executing a geofence warrant. On further *en banc* review, that decision was affirmed, but with no majority opinion, eight concurring opinions, and a dissent. *See United States v. Chatrie*, 107 F.4th 319 (4th Cir. 2024) *affirmed after rehearing en banc* 136 F. 4th 100 (4th Cir. 2025). Although the Fourth Circuit case spawned multiple opinions, it does not appear that ANY of them fully agreed with the rationale of the Fifth Circuit's decision in *Smith* and that at least three of them disagreed with it in strong terms. *See United States v. Chatrie*, 136 F.4th 100, 109 (Op. of Wilkson, J.) ("reject[ing] the assault on geofence warrants mounted by . . . the Fifth Circuit Court of Appeals"), 139 n.17 (Op. of Richardson, J.) (finding the argument that Google conducted a search in identifying the relevant records to be "squarely foreclosed" by precedent and stating that this "mistake . . . appears to have animated the Fifth Circuit's decision"), 155 (Op. of Berner, J.) (calling the idea that the government conducts a search when Google searches its own records "nonsensical").

In sum, where investigators used the available facts to tailor search warrants to particular locations and to particular times and *further* narrowed the searches to devices appearing at more than one of the particular locations, such searches meet the Fourth Amendment's particularity requirement. That is exactly what happened here. The Defendant's motion must be denied on these grounds.

13

III.    THE AGENTS ACTED IN GOOD FAITH IN OBTAINING AND EXECUTING THE WARRANTS.

Because of its "substantial costs", the Supreme Court has declined to apply the exclusionary rule when an officer reasonably relied on a magistrate's determination to issue a search warrant. *United States v. Leon*, 468 U.S. 897 (1984). This exception does not apply when (i) the affiant misled the magistrate, (ii) the magistrate abandoned his/her judicial role, (iii) the affidavit is so lacking in indicia of probable cause that it is unreasonable to believe in the warrant's existence, or (iv) the warrant is facially deficient in failing to particularize the place to be searched or things to be seized. *Leon*, 468 U.S. at 923. Courts have declined to apply the exclusionary rule when the agents obtained a warrant in an unclear area of the law. *See United States v. Levin*, 874 F.3d 316, 323 (1st Cir. 2017) (reversing suppression where government sought guidance from court in new type of warrant); *Smith*, 110 F.4th at 840 (noting "we cannot fault law enforcement's actions considering the novelty of the technique [geofences] and the dearth of court precedent to follow.")

Here, even though no clear precedent required that they do so, investigators applied for and obtained the search warrants. *See supra* p. 8 (listing cases allowing government to obtain tower dump data through 2703(d) orders); and *Chatrie*, 107 F.4th at 330-331 (finding a tower dump does not constitute a search). Investigators selected time periods/geographic locations where the perpetrators were known to be present. And, investigators took steps to further limit the breadth of the search by limiting its scope to only those devices that overlapped at two or more of the towers. Nothing from these circumstances makes it objectively unreasonable for the investigators to have relied on the validity of the warrants. Other courts that have addressed this issue have applied the good faith exception in similar circumstances. *Pricop*, 775 F.Supp.3d at 1040 (lack of Supreme Court or Ninth Circuit precedent gave agents no reason to doubt

14

availability of 2703(d) order to obtain tower dump data); *United States v. Walker*, 2020 WL 4065980 at *8; *United States v. Dickerson*, 2025 WL 2779095 at *4-5; *United States v. Sherod*, 2025 WL 1736279 at *6-7 (noting good faith exception).  Even in the cases the Defendant cites for the proposition that tower dumps require warrants or are impermissible general warrants, the courts applied the good faith exception and denied the relevant motions to suppress.  *Smith*, 110 F.4th at 838-840 (applying good faith to geofence data obtained through search warrant); *Medina*, 712 F.Supp.3d at 248 (applying good faith exception for tower dump data obtained through 2703(d) order); *Spurlock*, 778 F.Supp.3d at 1148 (applying good faith exception for tower dump search warrant).

Even if the Court finds that the warrants lacked sufficient particularity, the motion to suppress should be denied because the investigators acted in good faith in obtaining the warrants and there is no compelling reason to apply the exclusionary rule here.

CONCLUSION

To solve a midday, violent robbery of over $436,000 in cash that involved a courier being bound, pepper sprayed, and having a gun pointed at him, shots being fired, and the burning of a van, investigators applied for search warrants seeking records maintained by area wireless providers.  The warrants appropriately limited the request to a specific date, time, and geographic limitations based on the facts known at the time.  Investigators took steps to narrow the search parameters further to only those devices that appeared at multiple tower locations.  None of these appropriate investigative steps ran afoul of the Fourth Amendment and, even if they did, application of the exclusionary rule is not the appropriate remedy.  The motion should be denied.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    */s/ John J. Reynolds III*
John J. Reynolds III, BBO# 672295
Assistant United States Attorney
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3354
john.reynolds2@usdoj.gov

Dated:  October 30, 2025

Certificate of Service

I hereby certify that this document will be sent by email to the to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ John J. Reynolds III*
John J. Reynolds III
Assistant United States Attorney

16